UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

TRACEY BADE,                              )
                                          )
    Plaintiff,                            )
                                          )
v.                                        )    4:04CV1294 SNL
                                          )              (TIA)
JO ANNE B. BARNHART,                      )
COMMISSIONER OF SOCIAL SECURITY,          )
                                          )
    Defendant.                            )

## REPORT AND RECOMMENDATION

This matter is before the Court under 42 U.S.C. § 405(g) for judicial review of the denial of plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act. The case was referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b).

## Procedural History

On December 13, 2002, Plaintiff protectively filed an application for Disability Insurance Benefits, alleging disability commencing May 9, 1995. (Tr. 44-46) The application was denied. (Tr. 30-33) On March 24, 2004, plaintiff testified at a hearing before an Administrative Law Judge (ALJ). (Tr. 525-543) In a decision dated May 21, 2004, the ALJ determined that plaintiff was not under a disability at any time through the date of the decision. (Tr. 10-14) On July 27, 2004, the Appeals Council denied plaintiff's request for review. (Tr. 2-4) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## Evidence Before the ALJ

At a hearing before the ALJ, plaintiff was represented by counsel. Plaintiff testified, along

with his mother, Doris Bade. At the time of the hearing, plaintiff was 42 years old and lived with his mother. (Tr. 527, 532)

Plaintiff testified that he was injured on the job on May 9, 1995. After Plaintiff returned to work, he performed light duty, which included janitorial work such as cleaning and mopping floors, replacing paper towels in the restrooms, and picking up trash outdoors. According to Plaintiff, limitations resulting from the accident included lifting only 20 to 25 pounds and an inability to lift over his head. Plaintiff additionally testified that he suffered an injury to his shoulder, which eventually healed completely. However, he still experienced difficulty in moving his arms. Plaintiff testified that coworkers harassed him when he returned to work by teasing him and accusing him of not working. Plaintiff was eventually laid off and then terminated in December, 2002. He stated that he was never able to perform the duties of his old job as a result of the accident. Plaintiff had not worked since November of 2002, but he did receive several months of unemployment compensation. (Tr. 528-533)

Plaintiff testified that he had received his high school diploma. Throughout school, he was in special education classes. Plaintiff had no further education or training. Plaintiff stated that he had a hard time understanding things, including reading and writing. (Tr. 531-532)

Plaintiff visited his doctor for check-ups every year or so. During his last visit, the doctor indicated that Plaintiff looked good, although arthritis was setting in. Plaintiff testified that a typical day included doing yard work outside for two or three hours and then relaxing in the afternoon. He had a driver's license, and he testified that he drove to see his sister and to the grocery store. He did very little cooking and cleaning, but he was able to wash dishes and do laundry. He attended church every week. In addition, Plaintiff enjoyed collecting stamps. (Tr. 533-535)

Plaintiff's mother, Doris Bade, also testified at the hearing. She stated that Plaintiff had developmental disability problems as a child. She testified that the school pushed Plaintiff off to the side. He did participate in special reading programs. While in high school, Plaintiff attended workshop. Ms. Bade did not believe that Plaintiff was capable of living independently because he was unable to write checks or read and follow instructions. Plaintiff was unable to cook because he could not follow recipes. In addition, Ms. Bade opined that he could be in danger if he cooked in the kitchen. She noted that she did most of the driving. With regard to physical limitations, Ms. Bade testified that after his injury, Plaintiff could not pick up things or reach over his head. She opined that Plaintiff could not be employed in the real world due to his inability to follow directions and dislike for being tied down. In addition, Plaintiff had some interpersonal problems with coworkers. (Tr. 535-539)

Ms. Bade testified that Plaintiff could only lift about 20 pounds. He was told not to work over his head because it put pressure on his collarbone. Plaintiff did not walk normally. He was stiff on the left side, and he did not move his left arm when he walked. Ms. Bade stated that Plaintiff never fully recovered from his injury. He could no longer do all the yard work, and cutting the grass was difficult. (Tr. 540-541)

**Medical Evidence**

In December, 1983, Plaintiff complained of a tingling sensation. Dr. Samuel Bonney diagnosed a neuro-sensory disturbance that was not accounted for by a specific disorder. (Tr. 500) On October 24, 1994, Plaintiff complained of pain in his ribs after lifting boxes at work. Dr. Bonney prescribed medication and limited Plaintiff to lifting less than 25 pounds. (Tr. 498)

On May 9, 1995, Plaintiff suffered a work-related injury when a 1500 pound roll of paper

crushed his chest. Plaintiff was diagnosed with a left subclavian artery laceration, multiple rib fractures, bilateral hemopneumothoraces, and a left clavicle fracture. Dr. Richard Pennel performed a left carotid subclavian bypass. (Tr. 265-266, 313-316)

On May 16, 1995, Michael V. Oliveri, Ph.D., performed a neuropsychological examination. Dr. Oliveri estimated that Plaintiff's general intellect was compatible with mild mental retardation. Various subtests revealed a performance which ranged from defective to low average levels. Dr. Oliveri opined that these findings indicated either premorbid mild mental retardation or a borderline level of intellectual functioning. Plaintiff's reading skills were at a 2nd grade level. Assessment of new learning function revealed a capacity to benefit from repeated exposures. Drawing, writing, and spelling functions were abnormal. Dr. Oliveri assessed borderline to mild premorbid mental retardation and generalized limitations in neurocognitive functioning and behavior skills. He noted that Plaintiff's new learning and short term memory skills were relative strengths. Dr. Oliveri recommended that Plaintiff be generally managed from an environmental modification perspective due to his generalized cognitive limitations. Dr. Oliveri believed that Plaintiff would respond well to structure, repetition, and consistent reassurance. (Tr. 267-269)

Plaintiff was discharged from the hospital on May 19, 1995 with a final diagnosis of pulmonary contusion post blunt chest trauma. Dr. J. Cassat noted that Plaintiff did quite well while hospitalized and that a chest x-ray showed improvement. Dr. Cassat dismissed Plaintiff with prescription pain medication and orders to walk around and change positions often. He also advised Plaintiff to avoid straining, heavy lifting. (Tr. 176, 222)

Plaintiff returned to the hospital on May 20, 1995, complaining of drainage from the site where the left chest tube was placed and some nausea. His mother reported that Plaintiff had been

4

extremely anxious and coughed excessively. Dr. K. Florence assessed minimal drainage from the incision of the left chest and instructed Plaintiff on wound care and sutures in the right chest. (Tr. 200)

On May 23, 1995, Plaintiff presented to the ER, complaining of a possible medication reaction. Dr. Florence assessed acute anxiety reaction and treated Plaintiff with Haldol and Ativan. He returned to the ER the following day, and was diagnosed with a non-specific personality disorder. (Tr. 177-178, 184)

On June 5, 1995, Dr. Cassat restricted Plaintiff's work duty to half days on light duty, to be increased to full days light duty with no overhead reaching and no lifting more than 10 pounds. On June 26, 1995, Dr. Pennell released Plaintiff back to work with no restrictions. (Tr. 171-172)

Plaintiff presented to the ER on July 24, 1995 for complaints of chest pain. An ECG was abnormal, showing right ventricular conduction delay. X-rays revealed that Plaintiff's fractures were healing. Plaintiff was instructed to take Advil and avoid lifting more than 10 pounds for 4 days. (Tr. 161-168) Dr. Pennell examined Plaintiff the following day, noting probable musculoskeletal pain. He recommended that Plaintiff continue taking Advil and applying heat on a routine basis. (Tr. 513)

Plaintiff returned to Dr. Pennell on November 16, 1995. Plaintiff's mother reported that Plaintiff had intermittent numbness in his left hand which was associated with working above his head. Dr. Pennell diagnosed probable intermittent thoracic outlet compressions secondary to scar tissue. He recommended that Plaintiff avoid working with his arms above his head. (Tr. 512)

On May 2, 1996, Plaintiff followed up with Dr. Pennell. Plaintiff complained of tingling in the fingers of his left hand. However, doppler studies confirmed equal blood pressure in both arms and normal thoracic outlet maneuvers. Dr. Pennell encouraged Plaintiff to get used to the tingling,

5

as it would be a problem off and on. He further allowed Plaintiff to increase his activity as tolerated. He noted that Plaintiff had recovered sufficiently to be able to return to regular work duties with the same restrictions as before. (Tr. 510-511)

Plaintiff complained of chest pain on November 27, 1996, during which time an x-ray was performed. Comparison to prior x-rays revealed old and healed fractures with no definite acute process. Dr. Bonney recommended that Plaintiff continue limited work duty. (Tr. 153-156)

Dr. Philip Dean restricted Plaintiff to light duty on December 3, 1996. In addition, he referred him to physical therapy 2 to 3 times a week for 2 to 3 weeks. Nerve conduction studies performed on that same date revealed mild left ulnar neuropathy and mild left carpal tunnel syndrome. (Tr. 129-131)

Plaintiff attended 4 physical therapy sessions. On December 20, 1996, Jason Rudroff, P.T., noted that Plaintiff had been compliant with his home exercise program. He reported some improvement in Plaintiff's posture of the left shoulder. However, Plaintiff indicated that there was no improvement of the left upper chest pain and left upper extremity tingling. (Tr. 149)

Dr. Bonney continued Plaintiff on limited duty on December 30, 1996. On February 4, 1997, Dr. Bonney noted that Plaintiff's thenal muscle atrophy and nerve dysfunction were probably due to complications from his old work-related fracture on May 9, 1995. Dr. Bonney recommended that Plaintiff see another neurologist to verify. (Tr. 143, 145)

Plaintiff saw Dr. Weiss of World Wide Neurology Limited on April 8, 1997. Plaintiff complained of tingling in the tips of the fingers of his left hand. He reported generally good grip strength with an occasional tendency to drop things. Plaintiff had no weakness or limited range of motion in the left upper extremity. Dr. Weiss opined that Plaintiff sustained an injury to his brachial

6

plexus on the left affecting C6. He recommended an MRI of the cervical spine. He noted that Plaintiff's symptoms may slowly improve, but he could not state that there would be complete resolution of his sensory symptoms. (Tr. 135-137) A June 5, 1997 MRI indicated a normal cervical spine. (Tr. 141)

On March 20, 1998, Dr. Shawn L. Berkin examined Plaintiff for an evaluation of his prior injuries. Plaintiff reported that he returned to work in July of 1995 and continued to work on the date of the exam. Plaintiff complained of pain and tenderness in his left arm and shoulder; weakness in his left arm causing him to drop things; and limited motion of shoulder and pain in left arm when lifting. Examination revealed normal range of motion in the cervical spine and left shoulder. Plaintiff had decreased grip strength in his left hand. Based on Plaintiff's medical history, medical records, and the physical examination, Dr. Berkin opined that Plaintiff sustained a permanent partial disability of 65% of the left upper extremity at shoulder level from the fracture to his left clavicle. The rib fractures caused a permanent partial disability of 45% of the body as a whole. Further, Dr. Berkin opined that Plaintiff's mild mental retardation contributed to a 20% permanent partial disability to his body as a whole. Dr. Berkin believed that the pre-existing mental disability, combined with the disabilities from the work injury, resulted in an overall disability that exceeded the sum of the individual disabilities. (Tr. 501-505)

Subsequent follow-up appointments with Dr. Pennell in 2000 and 2002 revealed that Plaintiff was doing well and that Dr. Pennell was pleased with his progress. Dr. Pennell recommended that Plaintiff return in 2 years. (Tr. 507)

**The ALJ's Determination**

In a decision dated May 21, 2004, the ALJ determined that Plaintiff was insured for a Period

7

of Disability and Disability Insurance Benefits throughout the period of the decision. He found that Plaintiff engaged in substantial gainful activity from May 9, 1995, his alleged onset date, through November 15, 2002, thus foreclosing that time period. He determined that Plaintiff satisfied the requirement for a severe impairment because he was more than minimally limited by residuals from a left clavicle fracture and borderline intellectual functioning. Further, he found that Plaintiff did not meet or medically equal a listing in 20 C.F.R. pt. 404, subpt. P, App. 1. In addition, the ALJ noted that Plaintiff's allegations were not credible. He determined that Plaintiff had the residual functional capacity (RFC) to lift, carry, push or pull twenty-five pounds occasionally and frequently. Further, Plaintiff did not have any limitations in sitting, standing, or walking. He could understand, remember, and carry out simple instructions. Therefore, the ALJ concluded that Plaintiff could perform his past relevant work as a janitor and was thus not disabled. (Tr. 13-14)

Specifically, the ALJ found that Plaintiff's residuals from a left clavicle fracture and borderline intellectual functioning constituted a severe impairment. The ALJ noted that the ambiguity of borderline intellectual functioning versus mild mental retardation was resolved n favor of borderline intellectual functioning due to his assessment with a learning disorder while in school. He further found that Plaintiff's condition did not meet or medically equal a listing. He then assessed Plaintiff's RFC, noting that Plaintiff's fractures had healed and that seven weeks after the injuries, Dr. Pennell allowed Plaintiff to return to work with no restrictions. In addition, the most recent examination by Dr. Berkin revealed normal range of motion. The ALJ also assessed Dr. Oliveri's neuropsychological evaluation, which reported that Plaintiff had either borderline intellectual functioning or mild mental retardation. The ALJ noted Dr. Oliveri's opinion that Plaintiff had been doing well from a cognitive and behavioral perspective and that he would respond well to structure and repetition. (Tr. 10-12)

8

Further, the ALJ found that Plaintiff lacked credibility. He noted that Plaintiff worked for over seven years after his alleged onset date, performing the tasks of mopping, sweeping, and picking up garbage. He also determined that Plaintiff stopped working due to a layoff and not the impairments. In addition, the ALJ noted Plaintiff's ability to drive, perform household chores, and perform yard work, including mowing the grass. With regard to his mental condition, the ALJ pointed out that Plaintiff was able to work for decades in spite of this condition. Further, Plaintiff had not seen any doctors since filing his application, and he only took over-the-counter medication for pain. In addition, Plaintiff testified that he could lift up to twenty-five pounds. (Tr. 12-13)

Thus, the ALJ concluded that Plaintiff had the RFC to lift, carry, push, or pull twenty-five pounds, both occasionally and frequently. In addition, he had no limitations in sitting, standing, or walking, and he could understand, remember, and carry out simple instructions. The ALJ noted that this constituted a limited range of unskilled medium work and a full range of unskilled light work. Based on Plaintiff's past relevant work as a janitor, shredder, and assembler, the ALJ found that the job of janitor did not require more than light exertional capacity if performed as Plaintiff actually performed. The job was also unskilled. Therefore, the ALJ determined that Plaintiff had been able to perform his past relevant work as a janitor since November 16, 2002. The ALJ noted that educational factors such as Plaintiff's asserted illiteracy become relevant only after a plaintiff demonstrated an inability to perform past relevant work. Therefore, the ALJ concluded that Plaintiff was not disabled and was not entitled to benefits.

## **Legal Standards**

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as

"the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that plaintiff is not engaged in substantial gainful activity; (2) that he has a severe impairment or combination of impairments which significantly limits his physical or mental ability to do basic work activities; or (3) he has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) he is unable to return to his past relevant work; and (5) his impairments prevent him from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional

activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[1] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak 49 F.3d at 1354.

**Discussion**

---

[1]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

Plaintiff argues that the ALJ erred in failing to develop the record regarding Plaintiff's mental retardation. The Defendant, on the other hand, asserts that the ALJ properly determined that Plaintiff did not meet § 12.05C of the Listings. The undersigned finds that the ALJ did not properly assess whether Plaintiff's mental condition met § 12.05C and recommends that the case be remanded for further proceedings.

First, and contrary to Defendant's assertion, there is no indication from the record that the ALJ performed any meaningful determination of whether Plaintiff met a listing. While he noted in a footnote that the ambiguity between borderline intellectual functioning and mild mental retardation was resolved in favor of borderline intellectual functioning due to his prior assessment of a learning disorder, the medical record does not support this finding. Only Dr. Oliveri performed any testing of Plaintiff's intelligence. He noted Plaintiff's educational history as described by Plaintiff's mother. Dr. Oliveri further noted that this history was compatible with the diagnosis of borderline to mild premorbid mental retardation. (Tr. 523) In addition, the medical record refers to a history of mild mental retardation on several occasions. (Tr. 223, 231, 505)

Under 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.05, "[m]ental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." Further, a claimant meets the requisite level of severity when satisfying the requirements in A, B, C, or D. Plaintiff argues that he meets the requirements of C, which requires "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.05C.

12

The Plaintiff asserts that the ALJ erred by failing to develop the record to include a valid IQ score. This score, in addition to the significant work-related limitations found by the ALJ, would, according to the Plaintiff, demonstrate that he met the listing. The Defendant, on the other hand, argues that the record does not indicate that Plaintiff has deficits in adaptive functioning as required by the listing such that Plaintiff would be unable to meet the listing requirements for disability.

The undersigned notes that the ALJ has the duty to develop the record in cases where a crucial issue is undeveloped. Ellis v. Barnhart, 392 F.3d 988, 944 (8th Cir. 2005). In the instant case, there was a question whether Plaintiff suffered from mild mental retardation or borderline intellectual functioning. The ALJ resolved this issue without supporting data or indication that he considered listing 12.05C. "The ALJ's decision does not mention listing 12.05C, nor does it otherwise indicate that he considered the listing to be relevant to [Plaintiff's] disability claim. His discussion of step three is quite general . . ." Chunn v. Barnhart, 397 F.3d 667, 671 (8th Cir. 2005). This is a sufficient reason to remand the case for further proceedings. Id. at 672 (remanding for further consideration and findings where the ALJ failed to support his finding at step three that plaintiff did not meet the requirements for 12.05C, and the decision was unclear as to whether he even considered it). On remand, the ALJ should refer the Plaintiff for an IQ examination in order to properly develop the record and assess whether Plaintiff meets listing 12.05C. See Banks v. Massanari, 258 F.3d 820, 822 (8th Cir. 2001) (Social Security Administration sent the plaintiff, who had been enrolled in special education throughout school and who had been laid off from her janitorial position, for psychological and IQ testing).

Plaintiff also argues that the ALJ erred in failing to consult a vocational expert and that the ALJ's RFC finding was not based on substantial evidence. Because the case should be remanded for

13

further consideration at step three, the undersigned need not address Plaintiff's arguments regarding alleged errors committed at step four. Chunn, 397 F.3d at 672.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **REVERSED** and this case be **REMANDED** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have eleven (11) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/ Terry I. Adelman
UNITED STATES MAGISTRATE JUDGE

Dated this  22nd  August, 2005.